UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                       Case Number 16-20089
                                               Honorable David M. Lawson

v.

QUIENN LAVAR BRIDGES,

                Defendant.
_____/

## OPINION AND ORDER DENYING THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Quienn Lavar Bridges is charged with illegally possessing firearms as a convicted felon. He has filed a motion to suppress two handguns and ammunition seized by Detroit police officers during a warrantless investigative stop, and his ensuing confession. The success of Bridges's motion depends on the competing version of the facts of his encounter with the police, which in turn require credibility determinations. The Court held an evidentiary hearing on June 8, 2016, followed by a brief hearing on June 20, 2016, where additional evidence was received. The Court finds the Detroit police officers' testimony to be credible, which leads to the conclusion that he found the defendant in possession of a handgun during an investigatory stop and frisk. Moreover, even if there are doubts about the police officers' testimony, a second handgun was discovered in the front seat of the defendant's vehicle in plain view, and therefore is not subject to suppression. Therefore, the motion to suppress evidence will be denied.

I.

Steven Townsend, an eight-year veteran of the Detroit police department, testified that on January 13, 2016, he received a dispatch while he was on routine patrol in Detroit's tenth precinct.

The dispatcher reported that at 9:07 p.m., an individual called 911 and reported seeing a black male of dark complexion wearing a gray hat and dark coat holding two guns standing on Webb in Detroit. The caller described the man as having a small frame, approximately 5' 6", 150 to 160 pounds, and with braids in his hair. The 911 caller stated a desire to remain anonymous, but did provide a telephone number and address. Townsend and his partner, Detroit police officer Matthew Nasierowski, were dispatched to an address on Webb to investigate.

Townsend testified that upon arrival at the address at about 9:30 p.m., he saw an individual — eventually identified as the defendant — standing in the driveway near a 2002 minivan. Loud music was playing. The man matched the description given in the dispatch: African-American male with hair in braids near the address on Webb reported in the dispatch. He was wearing a grey hat and a "jacket," which Townsend believed was not a "full length" coat. Townsend testified that he could see the defendant's pants pockets. The defendant wore loose-fitting blue jeans low on his waist with a belt.

By that time of night, it was full dark. But Townsend said that the area was illuminated by a streetlight, and Tameka McKay, the defendant's girlfriend confirmed that a streetlight was in front of her house. Townsend, in the driver's seat, said he saw the imprint of a large-body semi-automatic pistol in the defendant's left pants pocket. The defendant had his hands in his coat pockets at the time. As Townsend approached, he asked if the defendant had a "CPL," that is, a permit to carry a concealed weapon. The defendant did not respond. Townsend reached with his right hand to remove the pistol; the defendant offered no resistance. The pistol was a Smith & Wesson 9 mm. loaded with sixteen rounds of ammunition. Townsend then had the defendant place his hands on

the minivan and he patted him down, discovering a box of ammunition in the upper "jacket" pocket.

The defendant was placed in handcuffs and detained, and Townsend walked him to the police car. After ascertaining the defendant's identity and confirming that he did not have a CPL, Townsend arrested the defendant for a state law firearms violation.

Townsend's partner, Matthew Nasierowski, testified that upon arrival at the address on Webb, he saw the tan minivan in the driveway in front of the house on the sidewalk. The van was running, the music was loud, and the defendant was near the driver's side door. The defendant matched the description reported by dispatch and also the written description received on the scout car's computer system. He said that the streetlights and lights from the residences were sufficient to allow the officers to make out features.

Nasierowski testified that he could not remember the defendant's outerwear, which he described in court as a jacket, but acknowledged that in an earlier description he characterized it as a "dark coat." He also agreed that the coat was three-quarter length and covered the defendant's knees. But Nasierowski said that after he exited the passenger side of the police car, he could see the magazine and handgrip of a gun in the defendant's pants pocket, and the coat did not obstruct his view. He commanded the defendant to raise his hands, the defendant complied, and Townsend took the defendant into custody.

As Townsend was dealing with the defendant, Nasierowski looked through the driver's window of the minivan and saw a large revolver on the driver's seat. He opened the door and retrieved the weapon, which has a defaced serial number. It turned out to be a .44 caliber Ruger.

The defendant testified to a different version of the encounter.  He explained that Tameka McKay had called him to report that she discovered that a window in the rear of her house was broken.  So the defendant went there after work to retrieve the handguns there, intending to transport them to his uncle's house for safety.  That evening, he was wearing grey pants around his waist; a grey hat; boots; and a heavy, long, black cashmere coat.  He had a pistol in his pants pocket, but he insists that the gun was not visible through the coat.

The defendant was standing by the porch when the police pulled up.  Through their car window, they asked him who he was and he told them.  They said they had received a report that someone was waiving a gun around.  Then they approach him, put him on their car, and searched him.  They retrieved the gun, and later asked him if he had a CPL.

Tameka McKay testified that the defendant arrived "home" around 9:00-9:30 p.m. that evening.  She did not see the initial encounter between the defendant and the police.  She was alerted to the police presence by her daughter, who said that the police had "Q" outside. She did state, however, that the defendant was wearing grey Levis, a sweater, and a black trench coat that was "a little bit too long for him."  By the time she came outside, the defendant already had been taken away.

No other witnesses testified.

After the initial hearing concluded, the Court scheduled a second hearing to allow the defendant to produce the clothes he wore that evening, which he said he still possessed.  The defendant testified that he wore grey Levis with a 36-inch waist and 30-inch length, a long-sleeve shirt untucked, and a sweater that extended above the waist.  He produced the pants and the coat.

-4-

He acknowledged that despite the cold temperature, he wore the coat unbuttoned and his hands were in his coat pockets.

Officer Nasierowski, recalled as a witness, acknowledged that the clothing the defendant produced matched the coat and pants he wore on January 13, 2016.  He testified that when the defendant had his hands in the coat pockets, the coat was pulled back and the pants pocket — containing the gun — was visible.  The defendant, he said, wore the pants low on his hips and the shirt did not cover them.  The defendant removed his hands from his pockets, but only after Nasierowski commanded him to do so.

After considering the testimony and viewing the exhibits, the Court finds that it is entirely plausible that the officers were able to see the handgun in the defendant's pants pocket, even when he wore his full-length trench coat.  If the defendant had his hands in his unbuttoned coat pockets, as he acknowledged he did that evening, the coat would be pulled back enough to expose the pants pocket to plain view.  The Court believes that the officers saw the gun in the defendant's pants pocket immediately upon their arrival, and their subsequent actions were taken in response to the discovery of the firearm on the defendant's person.

II.

The defendant posits his suppression motion on the premise that the police officers did not discover the handgun in his pocket until after they detained him and patted him down.  He contends that the officers could have seen no more that a "bulge" in his pocket.  And he argues that the police officers did not have a particularized and objective basis for suspecting him of criminal activity.  The defendant believes that the officers were acting on no more than a hunch when they conducted the

stop and frisk.  He points out that in cases where a bulge was observed on a defendant that has led to a valid detention, there were additional factors not present in this case.

The defendant alleges that he was standing on a public sidewalk near a legally parked vehicle, and not engaged in any immediately observable criminal activity at the time the officers approached and questioned him.  He argues that the only observation noted by the police officers for investigating the defendant was that they saw the outline of what appeared to be the imprint of a handgun in his front left pant pocket.  Even if that were true, he says, the United States Constitution and the Michigan Constitution both allow citizens to possess firearms, therefore, there was nothing per se illegal about the possession of a firearm.  And because it is not per se illegal to possess a firearm, possessing one could not lead to a reasonable suspicion of illegal activity.

Finally, if the stop and frisk were illegal, so must be the ensuing arrest.  Therefore, he contends, everything flowing from that should be suppressed, including the guns, ammunition, and his subsequent confession.

The Fourth Amendment protects "the people . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  A search occurs "[w]hen the Government obtains information by physically intruding on persons."  *Florida v. Jardines*, --- U.S. ---, 133 S. Ct. 1409, 1414 (2013) (internal quotation marks omitted) (quoting *United States v. Jones*, --- U.S. ---, n.3, 132 S. Ct. 945, 950-51, n.3 (2012)).  "A seizure occurs when 'under the totality of the circumstances, a reasonable person would have believed that he or she was not free to walk away.'"  *United States v. Alston*, 375 F.3d 408, 411 (6th Cir. 2004) (quoting *United States v. Saperstein*, 723 F.2d 1221, 1225 (6th Cir. 1983)).

-6-

Police-citizen encounters come in three variants: "'consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions; a temporary involuntary detention or *Terry* stop which must be predicated upon reasonable suspicion; and arrests which must be based on probable cause.'" *United States v. Campbell*, 486 F.3d 949, 953-54 (6th Cir. 2007) (quoting *United States v. Bueno*, 21 F.3d 120, 123 (6th Cir. 1994)).  *Terry* stops must be based on "reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

There is no dispute that the initial encounter between the officers and the defendant was consensual.  Consensual encounters are "permissible without any particularized suspicion because no seizure has occurred for purposes of the Fourth Amendment." *United States v. Alston*, 375 F.3d 408, 411 (6th Cir. 2004).  The officers allege that they approached and asked the defendant if he had a concealed pistol license.  That activity is not forbidden by the Fourth Amendment.  The defendant likewise states that the officers approached and engaged him in conversation.  The parties differ in what was discussed, but under either version of the conversation, the encounter was consensual. Therefore, there was no constitutional violation at the initial encounter.

When the pat-down for weapons occurred, however, the protections of the Fourth Amendment were triggered, because at that moment it was clear that the defendant was no longer free to walk away.  *Alston*, 375 F.3d at 411; *see Terry*, 392 U.S. at 24-25 (stating that "[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience"); *see also Robinson v. Howes*, 663 F.3d 819, 827 (6th Cir. 2011) (citing *Terry*, 392 U.S.

-7-

at 20) ("We look first to the moment Petitioner was actually 'seized,' thereby implicating the Fourth Amendment, to determine if the seizure was justified by reasonable suspicion.").

To justify a *Terry* stop, police officers must have "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an investigatory stop. *Terry*, 392 U.S. at 21; *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998). "The standard outlined in *Terry* and its progeny is not onerous." *Houston*, 174 F.3d at 813. The requisite level of suspicion "is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *McPherson v. Kelsey*, 125 F.3d 989, 993 (6th Cir. 1997), *cert. denied*, 523 U.S. 1050 (1998). "Moreover, reasonable suspicion can arise from evidence that is less reliable than what might be required to show probable cause." *Houston*, 174 F.3d at 813 (citing *Alabama v. White*, 496 U.S. 325, 330 (1990)); *McPherson*, 125 F.3d at 993.

When courts evaluate the validity of a *Terry* stop, they "first ask whether there was a proper basis for the stop." *United States v. Mays*, 643 F.3d 537, 541-42 (6th Cir. 2011) (internal marks omitted) (citing cases). If there was, then the court "must determine whether the degree of intrusion was reasonably related  in scope to the situation at hand." *Ibid.* "Officers may conduct a 'reasonable search for weapons for the protection of the police officer' when they have reason to believe that they are 'dealing with an armed and dangerous individual.'" *Id.* at 541 (quoting *Terry*, 392 U.S. at 27). However, the Supreme Court has made clear that there is no "firearm exception" to the *Terry* analysis. *Florida v. J.L.*, 529 U.S. 266, 272 (2000). In other words, a tip alleging an illegal gun by itself is not sufficient to justify a stop and frisk. *Ibid.*

In this case, the impetus for the police officers to investigate the defendant began with an anonymous phone call. "Where an informant tip, rather than police observation, is the basis of an

-8-

investigatory stop, the tip must exhibit 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" *Robinson*, 663 F.3d at 828 (quoting *J.L.*, 529 U.S. at 270). The defendant argues that the description sent to the officers, a black man in a grey hat and dark coat with guns in hands, was overly generic and lacked details such as height, weight, and hair length and style. The evidence does not support that argument. Although that is the description contained in officer Townsend's police report, officer Nasierowski testified that the dispatch and computer report also described the suspect as 5'6", 150 pounds, and with braids in his hair. This description matches very well the defendant's description on January 13, 2016. It is likely that the anonymous tipster was describing the defendant.

Nonetheless, although an accurate description is reliable to the extent that it identifies the person the tipster means to accuse, the physical description alone "does not show that the tipster has knowledge of concealed criminal activity." *Florida v. J.L.*, at 272. Reasonable suspicion "requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Ibid*. The tip itself in this case did not furnish a sufficient basis for a *Terry* stop and frisk of the defendant. *See Robinson*, 663 F.3d at 829 (citing *Terry*, 529 U.S. at 271-72).

But the tip is not the only information on which the officers relied when they detained the defendant. They testified that they also noticed a bulge in the shape of a gun in the defendant's pocket.

In *United States v. Bell*, 572 F. App'x 417 (6th Cir. 2014), police officers were on patrol in an area where there had been a number of recent robberies and shootings. The officers noticed the defendant walking on a street at 2:30 a.m. and illuminated him with a flashlight. *Id.* at 419. They noticed a bulge in the defendant's pocket in the shape of a gun. *Ibid*. The defendant grabbed his

pocket, one of the officers asked him to show his hands, and a gun was subsequently found in the defendant's pocket. *Ibid.* The Sixth Circuit found that the officer's eyewitness observations, the officers' experience, and that the encounter was at 2:30 a.m. in an area where recent robberies and shootings had occurred provided reasonable suspicion that the defendant was carrying a concealed weapon. *Ibid.* The *Bell* court noted that the defendant did not argue that carrying a concealed weapon in Michigan is legal, and was therefore not considered. *Ibid.*

The defendant cites several cases where the observation of a bulge in a suspect's clothing along with additional factors supplied reasonable suspicion to justify a *Terry* stop, attempting to distinguish them. *See United States v. Holyfield*, 282 F. App'x 129 (3d Cir. 2008); *United States v. Hunter*, 291 F.3d 1302 (11th Cir. 2002); *United States v. Moore*, 8 F. App'x 354 (6th Cir. 2001); *United States v. Stone*, 73 F. Supp. 2d 441 (S.D.N.Y. 1999), aff'd, 225 F.3d 647 (2d Cir. 2000); *United States v. Strahan*, 984 F.2d 155 (6th Cir. 1993); *United States v. Smith*, 574 F.2d 882 (6th Cir. 1978). The defendant correctly observes that all of these cases involve the observation of a bulge in a suspect's clothing, created by either weapons or drugs, which, along with additional factors, created a reasonable suspicion of criminal activity. But the only case the defendant cites where the Sixth Circuit found there was no reasonable suspicion to justify a *Terry* stop is *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009). *See*, however, is wholly distinguishable on the facts because it does not involve the observation of a bulge in a suspect's clothing. Rather, it involves a *Terry* stop initiated by police officers by stopping their vehicle in front of the suspect's vehicle for no other reason than they were parked in a parking lot late at night in a high crime area. *Id.* at 314–15. There is simply no relation between *See* and the present case.

Here, the officers observed the handgun in the defendant's pocket. The defendant argues, however, that even that information coupled with the tip is insufficient to justify the detention and frisk. He relies primarily on *Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1132 (6th Cir. 2015), where the court held that "[w]here it is lawful to possess a firearm, unlawful possession 'is not the default status.'"

In *Northrup*, an Ohioan went for a walk with his family, carrying a semi-automatic weapon holstered on his hip in plain view. *Id.* at 1130. Another Ohioan saw the firearm and called 911. *Ibid.* When the dispatched officer arrived, he engaged the man and subsequently handcuffed him and placed him in the back of his police car. *Ibid.* In Ohio, open possession of a firearm is legal and gun owners are not required to produce or even carry their gun licenses for inquiring officers. *Id.* at 1131 (citing firearms Ohio Rev. Code §§ 9.68(C)(1) and 2923.12). The two articulable facts that the police officer argued established reasonable suspicion to stop and detain the man were that there was a visible firearm and another citizen had called 911 to report a man with a firearm. *Ibid.* The Sixth Circuit found that the officer lacked reasonable suspicion to justify a *Terry* stop under those facts. *Id.* at 1133.

*Northrup*, however, addressed the open carry of a firearm in Ohio, whereas here, the defendant concealed the firearm. The *Northrup* court noted that "Ohio's concealed carry laws do not regulate 'open' carry of firearms." *Northrup*, 785 F.3d at 1132 (quoting *Mike DeWine, Ohio Att'y Gen., Ohio's Concealed Carry Laws and License Application* 15 (2015)). Therefore, Northrup's conduct could not establish a reasonable suspicion of criminal activity in *Northrup*. The *Northrup* panel found that Ohio gun laws, and the Fourth Amendment, cannot simply be disregarded "by detaining every 'gunman' who lawfully possesses a firearm." *Id.* at 1133.

-11-

By contrast, in Michigan,

(1) [a]n individual who is licensed to carry a concealed pistol shall have his or her license to carry that pistol and his or her state-issued driver license or personal identification card in his or her possession at all times he or she is carrying a concealed pistol or a portable device that uses electro-muscular disruption technology.

(2) An individual who is licensed to carry a concealed pistol and who is carrying a concealed pistol or a portable device that uses electro-muscular disruption technology shall show both of the following to a peace officer upon request by that peace officer:
> (a) His or her license to carry a concealed pistol.
> (b) His or her state-issued driver license or personal identification card.

Mich. Comp. Laws § 28.425f(1) and (2). In Michigan, it is illegal to "carry a pistol concealed on or about [one's] person, or, whether concealed or otherwise, in a vehicle operated or occupied by the person . . . without a license to carry the pistol as provided by law." Mich. Comp. Laws § 750.227(2). A person in violation of Michigan's concealed carry law is guilty of a felony. Mich. Comp. Laws § 750.227(3).

When the police officers saw the outline of a gun in the defendant's pocket, it was proper, under Michigan law, to inquire whether the defendant was in possession of a concealed carry license. The failure to produce the license supported the conclusion that the defendant was committing a felony. Therefore, the police officers articulated specific facts that justified the investigatory detention.

Once detained, officer Townsend seized the handgun from the defendant, handcuffed him, confined him in the patrol car, and checked his computer to determine if the defendant had a CPL. "The scope of the investigative stop depends on 'the circumstances that originally justified the stop,' *United States v. Martin*, 289 F.3d 392, 396 (6th Cir. 2002), and it is appropriate to consider whether the law enforcement officers, 'diligently pursued a means of investigation that was likely to confirm

-12-

or dispel their suspicions quickly, during which time it was necessary to detain the defendant, [*United States v. Foster*, 376 F.3d 577, 585 (6th Cir. 2004)]." *United States v. Smith*, 594 F.3d 530, 537 (6th Cir. 2010). "[J]udged by . . . the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances," *United States v. Caruthers*, 458 F.3d 459, 468 (6th Cir. 2006), the officers' conduct was reasonable. The officers were entitled to pat down the defendant to search for additional weapons. As noted above, "[o]fficers may conduct a 'reasonable search for weapons for the protection of the police officer.'" *Mays*, 643 F.3d at 541 (quoting *Terry*, 392 U.S. at 27). The officers did not detain the defendant for any longer than necessary to investigate whether he was carrying a firearm lawfully.

One last point not addressed by the parties: even if the detention and pat-down of the defendant violated the Fourth Amendment, there is no basis to suppress the firearm found on the front seat of the minivan. Officer Nasierowski testified that he saw the gun through the driver's side window in plain view. He did not conduct a search. The van was located in the driveway, partially blocking the sidewalk. So if the stop and frisk of the defendant was illegal, the "'question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *United States v. Galaviz*, 645 F.3d 347, 354 (6th Cir. 2011) (quoting *Hudson v. Michigan*, 547 U.S. 586, 592 (2006)).

"The Fourth Amendment generally requires police to secure a warrant before conducting a search." *Maryland v. Dyson*, 527 U.S. 465, 466 (1999). Two exceptions to the warrant requirement are the automobile and plain-view exception. "The automobile exception allows officers to search a vehicle without a warrant if they have 'probable cause to believe that the vehicle contains evidence

-13-

of a crime.'" *Galaviz*, 645 F.3d at 354 (quoting *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007)). "Under the plain-view doctrine, 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.'" *Ibid*. (quoting *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007)).

In *Galaviz*, police officers pursued the defendant in a vehicle, thinking him to be a suspect in a robbery. The defendant ignored signals to stop, and he drove to his residence. After he exited the car, the police discovered that he was not the robbery suspect, and therefore had no basis to detain him. But when approaching the house, officers noticed that in the car the butt of a handgun was lodged between the seats. The Sixth Circuit, noting that the burden of establishing possession of a concealed carry license is on the defendant in Michigan, *id*. at 356 (citing Mich. Comp. Laws. § 776.20), held that the officers were lawfully in a position to view the gun and "the incriminating nature of a handgun in [a] vehicle was immediately apparent." *Id*. at 355-56 (citing Mich. Comp. Laws § 750.227). Even though the car was locked, the "automobile exception provided officers with authority to enter the car." *Id*. at 357. On that basis, the Sixth Circuit affirmed the district court's denial of the defendant's motion to suppress "because [the gun] was in plain view, and not as a result of anything [the defendant] said or anything found on Galaviz's person after his detention. Although [the officer]'s pursuit of [the defendant] was a but-for cause of the officers' discovery of the gun, the gun [wa]s not a fruit of the seizure as defined by *Wong Sun* [*v. United States*, 371 U.S. 471 (1963)] and progeny." *Id*. at 354-57.

The same reasoning applies here. Even if the defendant could establish that the seizure of the Smith & Wesson 9 mm. was illegal, there is no basis to suppress the .44 caliber Ruger.

-14-

III.

The Detroit police officers had a proper basis to detain the defendant and search him for weapons.  The discovery of the handgun on the defendant's person and the handgun in the minivan did not result from a violation of the Fourth Amendment.

Accordingly, it is **ORDERED** that the defendant's motion to suppress evidence [dkt. #18] is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  July 21, 2016

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 21, 2016.

s/Susan K. Pinkowski
SUSAN K. PINKOWSKI

-15-